**UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**COLUMBIA DIVISION**

| | |
|---|---|
| **ANTHONY GREGG, in his individual capacity,**<br><br>      **Plaintiff,**<br><br>**v.**<br><br>**AMERICAN COLLEGE OF MEDICAL GENETICS AND GENOMICS, an Illinois non-profit corporation, and the AMERICAN COLLEGE OF MEDICAL GENETICS AND GENOMICS FOUNDATION, an Illinois non-profit corporation, and MARC WILLIAMS, in his individual capacity, and MAXIMILIAN MUENKE, in his individual capacity,**<br><br>      **Defendants.** | **Case No.**    3:22-cv-01218-MGL<br><br><br>**Judge** _____<br><br><br>**JURY DEMAND** |

## COMPLAINT

**Demand for Jury Trial: Pursuant to Fed. R. Civ. P. 38(b),**
**Plaintiff hereby demands trial by jury on all issues so triable.**

      **COMES NOW** Plaintiff, Dr. Anthony Gregg ("Dr. Gregg" or "Plaintiff"), by and through undersigned counsel, and for his Complaint against the Defendants, the American College of Medical Genetics and Genomics (the "ACMG" or the "College"), the American College of Medical Genetics and Genomics Foundation (the "ACMGF" or the "Foundation"), Dr. Marc Williams ("Dr. Williams"), and Dr. Maximilian Muenke ("Dr. Muenke") (sometimes collectively referred to herein as the "Defendants"), states as follows:

1

**PARTIES, JURISDICTION, AND VENUE**

A.     **DR. GREGG**

1.     Dr. Gregg is a highly successful physician, leader, and volunteer residing in Columbia, South Carolina. He has a lengthy and robust resume and has been practicing medicine for almost 40 years.

2.     Dr. Gregg is a nationally recognized leader in the medical practices of Obstetrics and Gynecology, Maternal Fetal Medicine, and Clinical Genetics.

3.     Prior to the Defendants' actions, alleged below, Dr. Gregg was highly regarded in the medical community.

4.     Prior to the events described in this Complaint, Dr. Gregg routinely authored and published scholarly articles in various medical journals across the country. He routinely gave presentations on his work.

5.     Because of his contributions to and prominence in the field, Dr. Gregg was elected to serve a six-year term as a member of the ACMG Board of Directors from 2009 through 2015. During this time, he became Vice President- Clinical Genetics of the College Board.

6.     ACMG Board members volunteer their time to the College, and this was the case with Dr. Gregg.

7.     Dr. Gregg was elected to serve on the ACMG Foundation Board from 2013 through 2015. During this time Dr. Gregg was Chair of the Development Committee. In this capacity Dr. Gregg interacted with prominent leaders of genetics and genomics companies. The goal was to raise substantial funds for the College and the Foundation. College and Foundation monies were used to support the missions and strategies of the College as well as the day-to-day operations of each.

8.      After being nominated by a nomination committee of the College to serve as President of ACMG, followed by a vote of affirmation by nearly 2,000 ACMG members, Dr. Gregg assumed a two-year role as President-Elect beginning in 2017 and ending in 2019.

9.      Dr. Gregg became President of the ACMG beginning in the Spring of 2019 and held this position until April 16, 2021, the conclusion of the 2021 Annual Meeting, defined *infra*.

10.      As relevant to this action, Dr. Gregg is an outspoken advocate and thought leader for the medical practice of prenatal aneuploidy screening[1] and prenatal carrier screening.[2]

11.      Dr. Gregg led writing groups and became the lead author of several highly cited documents such as position statements and practice resources for the ACMG.

12.      All of the documents produced by authors under Dr. Gregg's leadership underwent review by the ACMG members and/or Board of Directors prior to publication.

13.      The practice resource article titled, "Screening for autosomal recessive and X-linked conditions during pregnancy and preconception: a practice resource of the American College of Medical Genetics and Genomics" (the "Carrier Screening Article") was co-authored by Dr. Gregg and approved for publication by the ACMG Board of Directors on April 12, 2021. By this time, it had gone through the public comment phase of members and review by the College Board of Directors. The Board of Directors including Dr. Williams and the ACMG CEO, Dr. Muenke expressed their great pleasure with this document.

---

[1] Aneuploidy screening allows a person or family to understand their chances of having a child with specific genetic conditions.
[2] When carrier screening is done before or during pregnancy, it allows a person or family to learn of their risk of giving birth to a child with specific genetic disorders.

14.     Dr. Gregg firmly and passionately believes that doctors should provide equitable care to all individuals including those disadvantaged by race and financial hardship, especially in the field of genetic testing where this has not always been the case. Indeed, many of Dr. Gregg's articles and publications, including the Carrier Screening Article, unequivocally endorse and encourage the practice of offering the same prenatal screening options to patients independent of their race, ethnicity, and ability to pay. For example, in the Carrier Screening Article, and under Dr. Gregg's leadership the writing group wrote:

> Carrier screening paradigms should be ethnic and population neutral and more inclusive of diverse populations to promote equity and inclusion.
>
> …
>
> We strongly recommend that all payers provide coverage for Tier 3 carrier screening, as well as Tier 4 carrier screening in appropriate clinical circumstances such as personal/medical history or consanguinity, to ensure equitable care to all individuals including those disadvantaged by race and financial hardship.

A true and correct copy of the Carrier Screening Article is attached and hereby incorporated by reference as **Exhibit A**.

15.     Prior to the Carrier Screening Article, Dr. Gregg co-authored, during his time as president of the ACMG, other publications to ACMG members at large. For example, in the wake of the death of George Floyd in 2020, Dr. Gregg communicated to ACMG members this message:

> Dear colleagues,
>
> The Golden Rule is simple: "Treat others as you would want them to treat you."
>
> George Floyd's death represents the antithesis of this basic human tenet. Racism exists in America. Many of us have experienced it or observed it. Over the past weeks, issues of

4

> racism have dominated our nightly newscasts and our conversations. We all understand there is no simple solution to these challenging issues. However, as President of the American College of Medical Genetics and Genomics (ACMG) let me state our position and describe our path forward.
>
> The ACMG vehemently opposes racism and supports all efforts to more fully understand and address the factors that lead not only to disparities in justice, but also those that lead to disparities in health-care delivery and access. The ACMG supports peaceful protest. The gains in health care brought on by advances in genetics and genomics technology and their introduction to clinical practice belong to all of humanity, not only the employed, insured, or wealthy.
>
> …

A true and correct copy of the above message is attached and hereby incorporated by reference as *Exhibit B*.

16.    In addition to modernizing carrier screening to meet the expectations and needs of diverse populations, Dr. Gregg's published letter established a commitment to a new ACMG Diversity Equity and Inclusion Committee. He invited board member Dr. Katie Phelan to Chair this Committee. In that letter, Dr. Gregg articulates a College goal of improving the efficiency of carrier screening for cystic fibrosis so that people of all races and ethnic groups can benefit.

17.    Dr. Gregg is a long-standing member of the American College of Obstetricians and Gynecologists (ACOG). This is a group of nearly 50,000 people who provide care to women in the United States and in other countries.

18.    Prior to being elected president of ACMG, Dr. Gregg served on several committees of ACOG.

19.    He has co-authored documents for ACOG like those of ACMG. Topics included umbilical cord blood banking and caring for the pregnant patient with heart disease.

20.     Dr. Gregg was recognized as a leader in genetics as it intersects not only pregnancy care, but the care of women at all ages of life.

21.     In 2020, Dr. Gregg was asked by ACOG President, Dr. Ava Chalis, to speak during the ACOG President's Plenary Session. This was anticipated to be a live streamed event.

22.     The ACOG President's Plenary Session is considered a highlight of the Annual Clinical Meeting of ACOG. It was an honor for Dr. Gregg to be asked by the ACOG President to speak. The publicity and advertisement of this session is extensive and typically includes the photograph and brief biography of invited speakers. One example can be found at https://www.acog.org/news/presidents-blog/folder/2021/4/a-year-in-review-a-retrospective-from-71st-acog-president-eva-chalas-md-facog-facs     (accessed April 11, 2022)

23.     During all relevant periods, Dr. Gregg was and remains a dues-paying member of the ACMG.

**B.     THE DEFENDANTS**

24.     The ACMG was founded in 1991 and is the national professional organization for board certified clinical and laboratory genetics professionals.

25.     Voting members (Fellows) of ACMG are certified by the American Board of Medical Genetics and Genomics. Non-voting members include genetic counselors, trainees, and medical students, among others.

26.     The ACMG solicits individuals to join as members, advertising on their website: "Whether you're exploring career paths while earning a degree, in training, just starting your professional career, or well established in the medical genetics and genomics

field, ACMG has affordable membership designed to enhance your learning experiences, initiate collaboration and innovation with others in the field, and advance you (sic) career."[3]

27.     The ACMG may be served by serving a copy of the summons and complaint to its registered agent, C T Corporation System, at 208 SO LaSalle Street, Suite 814, Chicago, Illinois 60604.

28.     During the 2021 Annual Meeting, defined *infra*, Dr. Williams was the President-elect. His term in office as <u>President-elect</u> began in 2019 and concluded at 5:00 p.m. on April 16, 2021. At 5:00 p.m. on April 16, 2021, Dr. Williams became <u>President</u> of ACMG.

29.     During all periods relevant herein, Dr. Williams spoke and acted on behalf of the ACMG.

30.     Dr. Williams is the current President of ACMG.

31.     Dr. Muenke began his employment as Chief Executive Officer (CEO) of ACMG and the ACMG Foundation on October 7, 2019.

32.     Dr. Muenke is the current CEO of the ACMG and ACMGF and, during all periods relevant herein, spoke and acted on behalf of the ACMG and the ACMGF.

## C.     JURISDICTION AND VENUE

33.     Dr. Gregg is a natural person and a citizen of the State of South Carolina.

34.     The ACMG is a nonprofit corporation formed under the laws of the State of Illinois. The ACMG's principal place of business is located at 7101 Wisconsin Avenue,

---

[3] ACMG.net, *Join ACMG*,
https://www.acmg.net/ACMG/Membership/Join_ACMG/ACMG/Membership/
Join_ACMG.aspx?hkey=a3f4704c-acc9-48fd-9c66-125b58c6b492 (last visited April 8, 2022).

Bethesda, Maryland 20814. Therefore, the ACMG is a citizen of the States of Illinois and Maryland pursuant to 28 U.S.C. § 1332(c)(1).

35.     Dr. Williams is a natural person and citizen of the State of Wisconsin, domiciled and residing at W7521 Castle Heights Drive, Holmen, Wisconsin 54636.

36.     Dr. Muenke is a natural person and a citizen of the State of Maryland, domiciled and residing at 5131 Dudley Lane #52, Bethesda, Maryland 20814.

37.     This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332. There exists complete diversity of citizenship between Dr. Gregg and the Defendants. The amount in controversy greatly exceeds Seventy-Five Thousand Dollars ($75,000.00), exclusive of interests, costs, and attorneys' fees.

38.     This Court has personal jurisdiction over the Defendants pursuant to S.C. Code Ann. § 36-2-802, S.C. Code Ann. § 36-2-803, and the due process requirements of the United States Constitution.

39.     Pursuant to S.C. Code Ann. § 36-2-802, "A court may exercise personal jurisdiction over a person . . . doing business [in] … this State as to any cause of action."

40.     The following activities, all of which are ongoing, support Plaintiff's contention that the Defendants are subject to jurisdiction before this Court:

      (a) Both the College and Foundation have members and attempt to recruit new members in and from South Carolina;

      (b) The Foundation solicits charitable contributions from its South Carolina Members;

      (c) The College and Foundation host money-making events in South Carolina; and

      (d) The College sells and provides medical information to its members and non-member medical professionals in South Carolina.

41.     In particular, the College provided ACT Sheets to the medical community in South Carolina. The College has attempted to monetize these ACT Sheets in order to derive revenue from South Carolina physicians.

42.     Further, the College supports families, laboratories and professional networks that address newborn screening in South Carolina through its grants awarded by the Heath Resources Services Administration (HRSA) of the US Department of Health and Human Services (HHS). The College supports entities that conduct business in South Carolina through these and similar grants such as the Newborn Screening Translational Research Network (NBSTRN), the National Coordinating Center and its Southeast Regional Genetics Network (SERN). These entities hold regional meetings, charge a fee for attendance to physicians and laboratory geneticists who attend to enhance their education and share ideas. The College derives direct and indirect monetary benefits from the success of these meetings which have been held in Charleston, South Carolina.

43.     The College consistently invites member and non-member medical professionals to attend its annual meeting. The College derives revenue from the South Carolina based medical professionals who attend the annual meetings or purchase a digital subscription to the annual meeting.

44.     Pursuant to S.C. Code Ann. § 36-2-803(1)(d), the Defendants caused tortious injury to be suffered by Dr. Gregg in South Carolina via acts occurring outside South Carolina by:

> (a) Publishing the Video Release, defined *infra*, directly to ACMG members and professional organizations in South Carolina;
>
> (b) Publishing the Press Release, defined *infra*, directly to ACMG members and professional organizations in South Carolina; and

        (c) Deriving substantial revenue from Dr. Gregg's services rendered in South Carolina, including without limitation by the articles he writes in South Carolina.

45.    At all times during the events described in this Compliant, Dr. Gregg was in South Carolina.

46.    Exercising jurisdiction over the Defendants would not offend traditional notions of fair play and substantial justice because, among other things, the Defendants could have, and indeed should have, reasonably foreseen being hailed into a South Carolina court after it targeted Dr. Gregg in South Carolina over purported conduct he committed while they knew he was in South Carolina.

47.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because the Defendants are subject to personal jurisdiction in this District, and/or a substantial part of the events giving rise to this claim occurred in this District.

## FACTUAL BACKGROUND

### D.    THE APRIL 16 Q&A SESSION

48.    Every year, the ACMG sponsors and conducts an annual meeting to discuss scientific and scholarly developments on various topics relating to the practice of genetics and medicine.

49.    In 2021, the ACMG conducted its annual meeting between the dates of Wednesday, April 14, 2021, and Friday, April 16, 2021 (the "2021 Annual Meeting").

50.    The 2021 Annual Meeting was conducted via a virtual meeting platform that allowed speakers, program directors, audience members, and other users to engage in activities and to watch the various programs in digital format.

51.    The virtual meeting platform also had a chat feature, which allowed users to chat and pose questions to the various speakers.

52.     On April 14, 2021, Dr. Gregg presided over the final board meeting of his presidency via a virtual meeting platform.

53.     During this board meeting Dr. Gregg received compliments for completing the Carrier Screening Article, which the College had promised the Foundation Board for nearly 4 years.

54.     Dr. Gregg wrote this article and others from his South Carolina home to advance carrier screening for all people and with an express intent to help the Foundation earn charitable contributions to support the College's mission.

55.     The ACMG Foundation derived revenue from Dr. Gregg's efforts.

56.     It was well known by the ACMG and ACMG Foundation that completion of the articles of the type Dr. Gregg co-authored were integral to the Foundation's fundraising efforts.

57.     The Foundation knew Dr. Gregg was performing this work in South Carolina.

58.     Dr. Muenke was particularly pleased with these efforts, as his annual bonus is tied to the financial gains made by the Foundation.

59.     On the first day of the 2021 Annual Meeting, Wednesday, April 14, 2021, Dr. Gregg, as then-President of the ACMG, delivered introductory remarks as part of the President's Plenary Session (the "Plenary Session").

60.     During the entirety of the 2021 Annual Meeting, Dr. Gregg was in South Carolina giving his presentation to his computer, which was set up with a webcam and microphone.

61.     The Plenary Session, led by Dr. Gregg, included a contentious and thought-provoking debate between leading medical experts concerning the value of early outpatient management of Covid-19 (Dr. Peter McCullough) and a Pfizer Executive (Dr. Mikael Dolsten) regarding the efficacy, safety, and widespread use of Covid-19 vaccines.

62.     While some individuals, including Dr. Gregg, believed that the debate about Covid-19 vaccines and outpatient management strategies was beneficial and intriguing, there was a palpable tension due to the tenor and content of the session. College and board members were integrally involved with and federally funded to perform and evaluate Covid-19 testing. Following the session, no board member showed appreciation for the President's Plenary session as is customary, including Dr. Williams. Dr. Williams had previously expressed to Dr. Gregg that Dr. Peter McCullough should not be asked to speak.

63.     The general tenor of the board of directors was one that opposed Dr. Gregg's conservative views. This tenor was readily apparent during discussions surrounding the death of George Floyd, the 2020 election, and the January 6, 2021 events as well as discussions about the Ohio abortion bill and the College's position on abortion in general. Dr. Gregg refused to acquiesce to a College written position that would make highly political, non-medical, statements.

64.     The leftist political leanings of the ACMG Board have led the College to engage in more and more so called "woke" political activities that are not related to the College's medical mission.

65.     As ACMG President, Dr. Gregg was also a member of the Program Committee during the year leading up to the April 2021 meeting.

66.    A session titled *What's in a Panel A Decade of Expanded Carrier Screening* was proposed by ACMG members who also worked for Myriad Genetics. This session received a high score by program committee members, so this was selected to be presented as a concurrent session at the April Annual meeting.

67.    The program committee determined that an industry employee could not participate in preparation or implementation of this session due to conflicts of interest.

68.    Dr. Gregg was asked to lead the selection of speakers for this session and to host this session. He selected a diverse group of speakers that included a Black woman whose children have sickle cell disease and a Black male physician and lawyer who led Blue Cross Blue Shield on clinical matters that affect more than 106 million people.

69.    On the morning of the last day of the 2021 Annual Meeting, April 16, 2021, around 10:00 a.m. EST, Dr. Gregg hosted and participated with this panel of five (5) speakers, including himself, to discuss medical developments relating to prenatal carrier screening and the recently approved Carrier Screening Article. The panelists came from diverse backgrounds and their presentations and discussions lasted approximately 90 minutes.

70.    Towards the end of the 90-minute panel discussion, Dr. Gregg opened a Q&A session by asking the audience members to use the virtual meeting platform's chat feature to pose questions to the panelists. This is sometimes referred to herein as the "April 16 Q&A Session" or the "Q&A Session."

71.    During the Q&A Session, and at all times during the 2021 Annual Meeting, Dr. Gregg emphasized his commitment and passion for, and the ACMG's belief in, ethnic inclusivity and equity in medicine and prenatal carrier screening.

72.     In promoting the Carrier Screening Article, Dr. Gregg stated that the Carrier Screening Article, once it was published, would be an ACMG practice resource that would encourage medical providers and insurance carriers to extend prenatal carrier screening to a diverse population beyond white people, specifically stating, unscripted, that prenatal carrier screening should include "black people, brown people, and yellow people."

73.     A few moments later, an audience member and genetic counselor used the virtual platform's chat feature to attack Dr. Gregg for using the words "yellow people."

74.     Soon thereafter, the Q&A Session ended.

75.     Prior to the Q&A Session, on March 16, 2021, the Journal of the American Medical Association ("JAMA") published an article relating to race and terminology in the practice of medicine. The JAMA article states that racial and ethnic terms should not be used in noun form (e.g., "Blacks" and "Whites") but instead adjective form (e.g., "black people" and "white people").

76.     Dr. Gregg recalled the above guidance from JAMA during his unscripted statement during the Q&A Session and when searching for a third color envisioned the colors of the unity flag (i.e., the colors of the rainbow with a large yellow stripe down the center) before choosing yellow.

77.     Dr. Gregg meant no harm or offense by the use of the phrase "yellow people," and, as evidenced by his many years of scholarship, emphatically believes in medicine's inclusion of all people regardless of race, creed, or financial background.

**E.     THE DEFENDANTS PUBLICLY CENSURE DR. GREGG "IN A RUSH"**

78.     Within mere hours after the April 16 Q&A Session, Dr. Williams and Dr. Muenke, acting on behalf of both ACMG and ACMGF, created a video attacking Dr.

14

Gregg's use of the phrase "yellow people," divorcing it from its context and calling it "racially inappropriate," "offensive," an "incident," and an "episode."

79.    Based upon their previous politically contentious interactions with him, Dr. Gregg asserts upon information and belief that Dr. Williams and Dr. Muenke seized upon Dr. Gregg's gaffe to characterize his statement as racist misconduct. Both understood that Dr. Gregg's statement was a simple mistake, but they used the situation to retaliate and promote their own bona fides and left-leaning views. In short, the gaffe presented an opportunity to silence a dissenting voice.

80.    The video was titled, "ACMG CEO and Incoming President Address Racially Inappropriate Term Used in 2021 Meeting Session." The video is sometimes referred to herein as the "Video Release."[4]

81.    The Video Release was published to YouTube in the afternoon of Friday, April 16, 2021, shortly before the last session of the 2021 Annual Meeting.

82.    The Video Release was published to all audience members of the 2021 Annual Meeting, among many others, including people who did not attend the Q&A Session.

83.    In the Video Release, Dr. Williams and Dr. Muenke made the following statements about Dr. Gregg:

> **DR. MUENKE:** Good afternoon. I am Max Muenke and I am the CEO of The American College of Medical Genetics and Genomics. Earlier today, in a meeting session, our outgoing President [Dr. Gregg] used a term that was racially inappropriate and offensive. Earlier we posted a very short statement in a sincere attempt to clearly state that we do not

---

[4] The Video Release is still online and is available for the Court's convenience at: https://www.youtube.com/watch?v=B15RHeuUYm4 (last visited April 10, 2022).

approve of the language used and that we deeply apologize on behalf of the College. We know that some said that the apology did not go far enough. As the ACMG CEO, I want to convey my deepest commitment to diversity, equity and inclusion as evidenced by our recent statements. Despite such express intent, incidents such as today's underscore that we have much work to do. We will strive to learn from today's unfortunate incident and do better in the future. Again, I want to express clearly and vehemently that we do not condone the language used in this meeting earlier this morning. Next, I would like to introduce Dr. Mark Williams, the incoming ACMG President, who will begin his Presidency at the end of this session today.

**DR. WILLIAMS:** Thank you Dr. Muenke. The American College of Medical Genetics and Genomics is committed to diversity, equity and inclusion as evidenced by our recent statements, the content of this meeting, and in particular the symposium. Despite such intent and commitment, incidents such as today's emphasis the importance of recognizing implicit and systemic biases that are present in all of us. Episodes such as this should be recognized as sentinel events. The most effective way to react to a sentinel event does not utilize a culture of blame or scapegoating, but needs a robust root cause analysis that leads to recommendations for improvement and a culture that prioritizes the improvements for implementation, accompanied by ongoing monitoring to ensure the improvements become routine as part of the organizational mission. Efforts as involved in this represent significant cultural change. Inherent in this process of change will be errors, missteps, and dead-ends. The commitment to cultural change involves working as best as possible to anticipate and avoid errors; but also, when an error occurs, as is inevitable, to use that to learn and improve. To accomplish this will involve everyone; our fellows, members, colleagues, collaborators, anyone that is invested in making the field of genetics and genomics accessible and inclusive. I look forward to leading the College in this critical activity in the two years as your President. And I ask for your help, and most importantly, your kindness and support as we strive to improve. Thank you very much.

84.    The Video Release was rushed and intentionally referred to Dr. Gregg's statements out of their context.

85.     Indeed, the Video Release does not disclose the actual phrase used by Dr. Gregg or its context, leaving the viewer to wonder what words were said by Dr. Gregg.

86.     Had the audience been provided the actual phrase or its context, the audience would have perceived the situation differently, in a light favorable to Dr. Gregg.

87.     A few days later, on Monday, April 19, 2021, the Defendants published a written press release about the April 16 Q&A Session, which echoed the statements made in the Video Release (the "Press Release").

88.     A true and correct copy of the Press Release is attached and hereby incorporated by reference as ***Exhibit C***.

89.     The Defendants' Press Release again avoided disclosure of the statement made by Dr. Gregg or the statement's context.

90.     The Defendants widely distributed the Press Release via email and social media to more than 2,000 ACMG members and professional organizations.

91.     The Defendants published the Video Release and Press Release in a rush and without sufficient disclosure of the underlying facts.

92.     In a text message, the ACMG and ACMGF's general counsel, Lynn Fleischer, admitted to Dr. Gregg that Defendants' actions were done "in a rush":

17



93.     Dr. Gregg's unscripted word choice would have been quickly forgotten but for the ACMG's Video Release and Press Release.

94.     Indeed, the Defendants took a two-word phrase, intentionally divorced it from its context (which encouraged racial and ethnic inclusivity) and transformed it into a flash point for racial insensitivity worthy of condemnation.

95.     The Defendants grossly overreacted to the situation. They converted what was at worst a minor gaffe into a major scandal. Their actions were based in part on their political animus.

## F.     DR. GREGG RESIGNS AND SUFFERS SUBSTANTIAL DAMAGE TO HIS REPUTATION AND SEVERE EMOTIONAL DISTRESS

96.     Several hours after the Video Release was published, around 5:05 p.m. on April 16, 2021, Dr. Gregg tendered his resignation as President of the ACMG.

97.     Because of the Defendants' persistence to take unauthorized and outrageous actions and unwillingness to pause and to disclose the underlying facts including the context of the remarks made, Dr. Gregg had no other choice but to resign as President.

98.     Dr. Gregg would not have resigned but for the Defendants' plans to rush forward and to pillory him via the Video Release and Press Release.

99.     As a direct and proximate result of the Video Release and Press Release:

(a) Dr. Gregg lost future speaking opportunities and had the planned speaking engagement with ACOG cancelled within 48 hours of the ACMG press release;

(b) Dr. Gregg was asked not to proceed with his application for an appointment at the University of South Carolina School of Medicine as a result of the nationwide publicity stemming from the Video Release and Press Release;

(c) Dr. Gregg is now forced to disclose the matter when asked on employment applications, applications for hospital privileges, and state licensing boards;

(d) The Video Release and Press Release require him to discuss specific details of the ACMG when asked about this by current and future patients; and

(e) Dr. Gregg fears for his safety and his family's safety as he has been portrayed a racist by the Defendants;

(f) Dr. Gregg believes his children and wife will suffer as a result of ACMG's actions which are highly visible when searching Dr. Gregg's name and association with ACMG on the internet; and

(g) Dr. Gregg now suffers from undue stress, sleeplessness, and has suffered a personal physical injury.

## G.    THE DEFENDANTS KNOWINGLY AND INTENTIONALLY BREACHED THE DISCIPLINARY PROCEDURES REQUIRED BY THE ACMG BYLAWS

100.    The ACMG has enacted bylaws governing its members, officers, and directors (the "Bylaws"). A true and correct copy of the Bylaws, as they existed at the time of the events alleged herein, is attached and incorporated by reference as ***Exhibit D***.

101.    Sections 8.2 and 8.3 of the Bylaws state:

**Section 8.2 Disciplinary Policy.** The Board of Directors may censure, suspend, expel, or otherwise discipline any member found to (1) no longer meet the qualifications for membership, (2) be deficient in moral character or professional competence, (3) be guilty of professional misconduct, or (4) have acted in a manner prejudicial to the interests of the College.

**Section 8.3 Disciplinary Procedures.** (a) Questions regarding possible disciplinary action shall be referred by the President to a three-person Inquiry Committee. The Inquiry Committee shall be composed of one director and two other members of the College appointed by the Board of Directors with due regard for potential conflicts of interest.

(b)    The Inquiry Committee shall investigate and evaluate the matter. The committee shall notify the member who is the subject of the inquiry that an inquiry is under way. Such notice shall be sent by registered or certified mail not less than thirty days prior to the next meeting of the Inquiry Committee and shall advise the member that he or she may appear before the committee and present an oral or written statement.

20

(c)      After thorough and impartial consideration, the Inquiry Committee shall submit its findings, conclusions, and recommendations in a written report to the Board of Directors. A copy of such report shall be sent to the member who is the subject of the inquiry.

(d)      Before final action is taken by the Board of Directors upon a recommendation of the Inquiry Committee for disciplinary action against a member, written notice shall be sent to the member.  Such notice shall be sent by registered or certified mail not less than thirty days prior to the next meeting of the Board of Directors. Such notice shall state that the member may appear in person before the Board of Directors, with or without legal counsel, and present an oral or written statement objecting to the findings, conclusions, and recommendations of the Inquiry Committee.

(e)      Disciplinary action against any member shall require the affirmative vote of two-thirds of the currently seated directors present at the meeting of the Board of Directors at which such action is considered. The director who served on the Inquiry Committee may be present but shall not vote on the matter.

(f)      The College shall establish and publish detailed disciplinary and fair hearing rules and procedures consistent with these Bylaws and subject to approval by the Board of Directors.

102.      The Video Release and Press Release constitute a "censure" under section 8.2 of the Bylaws. More broadly, the Video Release and Press Release constitute a "disciplinary action" by the ACMG.

103.      By publishing the Video Release and Press Release, the Defendants intentionally violated and ignored the Disciplinary Procedures outlined in sections 8.2 and 8.3 of the Bylaws.

104.      The disciplinary procedure provisions of section 8.3 are designed to provide due process to ACMG members in exchange for the member's dues.

105.    Dr. Gregg, as a dues-paying member of ACMG, was not afforded this disciplinary procedure prior to the Defendants' Video Release and Press Release.

106.    Dr. Williams and Dr. Muenke acted, in part, because of their political animus towards Dr. Gregg.

## CAUSES OF ACTION

### Count 1—Breach of Contract
### (Alleged against ACMG, Muenke and Williams)

107.    Dr. Gregg restates and incorporates by reference the above paragraphs as if fully realleged herein.

108.    The ACMG Bylaws are the terms of an enforceable contract between ACMG and its members. The members pay dues and, in exchange, the ACMG offers: (a) educational benefits ("[S]ignificant discounts on a wealth of live, live (sic) streamed and on-demand educational and maintenance of certification offerings"), (b) collaboration and advocacy benefits ("Opportunities to collaborate, innovate and advocate for your patients and the profession are offered throughout the year"), (c) news and publications benefits ("Medical Genetics and Genomics and College news to keep you current. ACMG members also enjoy a 20% discount on Springer and Wiley publications"), (d) medical genetics practice resource benefits ("Clinical and laboratory practice guidelines, standards of practice, draft documents for review and comment"), (e) reimbursement and coding resource benefits (providing pocked guides for "handy reference for determining appropriate codes for genetics services"), and (f) employment resource benefits (noting that members receive the "ACMG Salary Survey Report" which provides members "with the data you need to get that raise, negotiate a new job, advise graduating trainees, or

compare your + compensation to standards in the field").[5]  As well, all of these resources are provided to practitioners in South Carolina.

109.    Dr. Gregg, as a dues-paying member of the ACMG, was entitled to the due process protections outlined in the Bylaws relating to disciplinary procedures, as previously alleged.

110.    Defendants' publication of the Press Release and Video Release constitute a "censure" for which Dr. Gregg was entitled to the due process procedures set forth in section 8.3 of the Bylaws.

111.    The ACMG breached those provisions by rushing to censure Dr. Gregg without following the due process procedures outline in section 8.3 of the Bylaws.

112.    The Defendants' breach caused Dr. Gregg to suffer substantial damages.

113.    The Defendants are liable for substantial damages resulting from their breach, including without limitation consequential and incidental damages, resulting from their breach of the disciplinary procedures outlined in the Bylaws.

## Count 2—Defamation
### (Alleged against all Defendants)

114.    Dr. Gregg restates and incorporates by reference the above paragraphs as if fully realleged herein.

115.    The Video Release and Press Release published false statements constituting actionable opinion. The Video Release and Press Release imply the existence of facts not disclosed by the publications. The Defendants' failure to disclose the

---

[5] ACMG.net, *Member Benefits*,
https://www.acmg.net/ACMG/Membership/MemberBenefits/ACMG/Membership/Member-Benefits.aspx?hkey=c4862185-ae45-4652-b83d-6a088fb2381b (last visited April 8, 2022).

underlying facts does not put the viewer or reader in a reasonable position to draw their own conclusions about Dr. Gregg's statements.

116.    The Video Release and Press Release are of and concerning Dr. Gregg because, among other things, the publications specifically refer to him.

117.    The Video Release and Press Release are capable of a defamatory meaning because, when read and viewed by a reasonable reader in context, the specific charges of conduct tend to: (a) subject Dr. Gregg to hatred, ridicule, and contempt, (b) diminish Dr. Gregg's standing in the community, and (c) denigrate Dr. Gregg's fitness for his occupation.

118.    The Video Release and Press Release are defamatory *per se*.

119.    The Defendants published the Video Release and Press Release with the intent to discredit and harm Dr. Gregg and with a reckless disregard of the truth, intentionally omitting context and the underlying facts that would have exculpated Dr. Gregg in the minds of reasonable viewers and readers.

120.    Dr. Gregg is a private figure for purposes of this action.

121.    Dr. Gregg has suffered significant reputational harm and other damages as a result of the Video Release and Press Release. Dr. Gregg will continue to suffer perpetual reputational harm as a result of those publications.

122.    As a proximate result of the Video Release and Press Release, Dr. Gregg suffered severe emotional distress and personal physical injury.

### Count 3—Defamation by Implication
**(Alleged against all Defendants)**

123.    Dr. Gregg restates and incorporates by reference the above paragraphs as if fully realleged herein.

124.    Alternatively, the Video Release and Press Release are actionable under a theory of defamation by implication. It is a form of libel to juxtapose true facts to imply a defamatory connection between them or create a defamatory implication by omitting material facts.

125.    The Video Release and Press Release, by omitting the material underlying facts of Dr. Gregg's actual statements and their context, create a defamatory implication that severely impugns the reputation of Dr. Gregg.

## Count 4—False Light
### (Alleged against all Defendants)

126.    Dr. Gregg restates and incorporates by reference the above paragraphs as if fully realleged herein.

127.    The Defendants, through publication of the Video Release and Press Release, intentionally placed Dr. Gregg in a false light that is highly offensive to a reasonable person.

128.    The Defendants knew or acted intentionally and with reckless disregard of the reality that by failing to disclose the underlying facts and context of the Q&A Session, Dr. Gregg might or would be placed in a false light before the public.

129.    The Video Release and Press Release attributes to Dr. Gregg characteristics, conduct, or beliefs that are false. As a result, Dr. Gregg was placed before the public in a false light.

## Count 5—Intentional Infliction of Emotional Distress
### (Alleged against all Defendants)

130.    Dr. Gregg restates and incorporates by reference the above paragraphs as if fully realleged herein.

131.    In part based upon their political animus, the Defendants intentionally and recklessly inflicted severe emotional distress upon Dr. Gregg.

132.    Knowing the dramatic damage their conduct would do to Dr. Gregg's reputation and emotional well-being, the Defendants were certain or substantially certain that such distress would result from their conduct.

133.    The Defendants' conduct was extreme and outrageous as to exceed all possible bounds of decency. The Defendants conduct must be regarded as atrocious and utterly intolerable in a civilized community.

134.    The Defendants' actions caused Dr. Gregg's severe emotional distress.

135.    The emotional distress suffered by Dr. Gregg was so severe that no reasonable man could be expected to endure it.

**WHEREFORE**, Plaintiff Anthony Gregg respectfully prays:

(a) That judgment be entered against the Defendants, jointly and severally, for substantial compensatory damages in an amount to be determined at trial;

(b) That the Defendants be held liable for Dr. Gregg's personal physical injuries, the severe emotional distress Dr. Gregg has and will suffer along with the perpetual reputational harm it has caused Dr. Gregg;

(c) That judgment be entered against the Defendants, jointly and severally, for punitive and treble damages in an amount to be determined at trial;

(d) That Dr. Gregg recover pre- and post-judgment interest;

(e) That Dr. Gregg recover his reasonable attorneys' fees and expenses from the Defendants, jointly and severally;

(f) For trial by jury on all issues so triable;

(g) That all costs of this action be taxed to the Defendants; and

(h) That the Court grant all such other and further relief that the Court deems just and proper, including equitable relief.

Respectfully submitted,

**ROBINSON GRAY STEPP &
LAFFITTE, LLC**

***/s/ Monteith P. Todd***
Monteith P. Todd (Bar No. 3125)
1310 Gadsden Street,
Columbia, South Carolina 29201
Phone: (803) 929-1400
Fax: (803) 929-0300
mtodd@robinsongray.com


Todd V. McMurtry
(*pro hac vice* motion forthcoming)
J. Will Huber
(*pro hac vice* motion forthcoming)
**HEMMER DEFRANK WESSELS, PLLC**
250 Grandview Drive, Suite 500
Fort Mitchell, Kentucky 41017
Phone: (859) 344-1188
Fax: (859) 578-3869
tmcmurtry@hemmerlaw.com
whuber@hemmerlaw.com


*Trial Attorneys for Plaintiff,*
*Dr. Anthony Gregg*